IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION


MARK TARLTON,                          )
                                       )
                    Plaintiff,         )
                                       )
v.                                     )        No. 2:07-CV-120
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )


## <u>MEMORANDUM OPINION</u>

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of

defendant Commissioner's final decision denying plaintiff's claim for disability insurance

and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social

Security Act. For the reasons provided herein, defendant's motion for summary judgment

[doc. 17] will be granted, and plaintiff's motion for summary judgment [doc. 15] will be

denied.


I.


*Procedural History*


Plaintiff was born in 1972. He applied for benefits in May 2003, claiming to

be disabled by pain, migraines, posttraumatic stress disorder ("PTSD"), anxiety, hepatitis C,

previous broken backs, previous broken necks, and the alleged removal of his spleen, left

kidney, half of his stomach, and half of his large and small intestines. [Tr. 63, 70, 103, 629].

Plaintiff alleged a disability onset date of October 11, 2000.  [Tr. 63, 629].[1]  The present

applications were denied initially and on reconsideration.  Plaintiff then requested a hearing,

which took place before an Administrative Law Judge ("ALJ") on January 27, 2005.

On March 18, 2005, the ALJ issued a decision denying benefits.  He concluded

that plaintiff suffers from "generalized anxiety disorder, most recent episode of bipolar

disorder, degenerative disc disease and chronic obstructive pulmonary disese [sic]," which

are "severe" but not equal, individually or in concert, to any impairment listed by the

Commissioner.  [Tr. 23-24].  Terming plaintiff's subjective complaints "not totally credible"

in light of his activity level and his significant past history of polysubstance abuse, the ALJ

found plaintiff to have the residual functional capacity ("RFC") "to perform simple, low

stress, unskilled light exertion that does not require lifting more than 35 pounds and that does

expose [him] to respiratory irritants."  [Tr. 24-25, 27].  Relying on vocational expert

testimony, the ALJ determined that plaintiff remained able to perform a significant number

of jobs existing in the regional and national economies.  [Tr. 26-27].  Plaintiff was

accordingly deemed ineligible for benefits.

Plaintiff then sought, and was denied, review from the Commissioner's

Appeals Council, despite the submission and consideration of additional medical records.

---

[1] Previous benefits applications were denied on November 8, 2002, and not further appealed. [Tr. 113, 620].  Those denials serve as res judicata on the issue of disability prior to November 9, 2002.  In addition, plaintiff does not contest that his insured status expired on June 30, 2003. [Tr. 797].  To qualify for disability insurance benefits, plaintiff must therefore prove that he was disabled on or before to that date.  *See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

[Tr. 7, 10-11].[2]  The ALJ's ruling became the Commissioner's final decision.  *See* 20 C.F.R.

§§ 404.981, 416.1481.  Through his timely complaint, plaintiff has properly brought his case

before this court.  *See* 42 U.S.C. § 405(g).

## II.

### *Applicable Legal Standards*

Review of the Commissioner's decision is confined to whether the ALJ applied

the correct legal standards and whether his factual findings were supported by substantial

evidence.  42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.

1997).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The "substantiality of

evidence must take into account whatever in the record fairly detracts from its weight."

---

[2] Plaintiff's additional documents are discussed at length in his brief and are included in the administrative record.  [Tr. 642-793].  "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).  This court can, however, remand a case for further administrative proceedings, but only if the claimant shows that her evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g).  *Id.*  Despite numerous prior admonitions from this court in other cases, the present plaintiff's law firm has made no effort to articulate how the late-submitted evidence warrants sentence six remand, nor is sentence six even addressed in plaintiff's briefing.  The issue is accordingly waived, and plaintiff's additional medical evidence has *not* been considered.  *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate.");  *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted);  *see also* Fed. R. Civ. P. 11(b)(2), (c).

*Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)).  In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review.  *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability.  42 U.S.C. § 423(a)(1).  "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A).[3]  Disability is evaluated pursuant to a five-step analysis summarized as follows:

---

[3] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability.  42 U.S.C. § 1382.  "Disability," for SSI purposes, is defined the same as under § 423.  42 U.S.C. § 1382c(a)(3).

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520).  Plaintiffs bear the burden of proof during the first four steps.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five.  *See id.*

### III.

### *Background*

Plaintiff has a high school diploma. [Tr. 109].  His past relevant employment is as a factory worker and a grocery stocker. [Tr. 166].

Plaintiff is purportedly no longer able to drive. [Tr. 127].  He alleges constant pain throughout his body [Tr. 151-52, 180], is allegedly unable to bend over to tie his own shoes [Tr. 155], has "lost all strength physical" [Tr. 174], and "can't lift nothing no more." [Tr. 809].  Plaintiff contends that, secondary to a 1989 automobile accident, his "body is not

physical[ly] able to do the work." [Tr. 125]. He states that his pain was worsened by a 2002 accident in which his girlfriend was killed and in which he: had consumed alcohol; was not wearing a seatbelt; was thrown from the vehicle; may or may not have been driving; and tested positive for marijuana upon treatment at the hospital. [Tr. 310, 315, 330, 335, 812].[4]

Plaintiff claims to suffer severe headaches every other day. [Tr. 802]. He states that his neck pain, in particular, is "just unbearable." [Tr. 808]. He also complains of post-traumatic stress disorder, insomnia, and anxiety secondary to his history of motor vehicle accidents. [Tr. 810-11]. He testified that he does no housework because standing increases his pain. [Tr. 814].

Nonetheless, plaintiff has remained able, after his alleged disability onset date, to water flowers, care for his dogs, climb atop a roof at least once, lay flooring at least once, prepare breakfast, "coon hunt" on multiple occasions, fish, "walk in the woods," and make his way to a corral where he was pinned by either a cow or a horse. [Tr. 127-28, 278-79, 301, 394, 397, 438, 506]. Although in June 2003 plaintiff told the Commissioner that he rarely leaves his home [Tr. 127], in August 2003 he told a treating physician that he was "much better" and that he was going out with friends, increasing his daily activities, and had "actually gone [on] a trip recently with a friend and tolerated it very well." [Tr. 442]. As late as November 26, 2003, plaintiff continued to hunt. [Tr. 438]. However, in December 2003

---

[4] Plaintiff also received emergency room treatment following a 1990 automobile accident of which he "freely admitted he was engaging in alcohol consumption." [Tr. 215]. Because records pertaining to a *1989* wreck have not been provided to the Commissioner, it is unclear whether that accident was also alcohol-induced.

and January 2004, plaintiff told the Commissioner that his health had further declined, rendering him no longer able to hunt - perhaps due to having recently fallen while hunting and having been recently discharged by two treating physicians for noncompliance with treatment and drug testing. [Tr. 176, 188].

## IV.

### *Relevant Medical and Substance Abuse Evidence*

### A. <u>Physical</u>

When treating plaintiff following his April 1990 motor vehicle accident, emergency room staff noted extensive facial scarring and abdominal surgical scars secondary to the September 1989 wreck. [Tr. 215]. Emergency room records following a July 1990 wreck indicate that the spleen, left kidney, and part of the stomach had been previously removed, and multiple surgical wires had been inserted within the left jaw and eye areas. [Tr. 220, 222, 271].

Plaintiff has repeatedly claimed that half of his large and small intestines were also removed and that "he actually died about 6 times" following the 1989 crash. [Tr. 400, 801]. These assertions are not documented by any objective evidence of record, and April 2002 imaging found both intestines to have "a normal appearance." [Tr. 362]. Plaintiff also claims to have been in multiple motorcycle accidents prior to 1989 "with a total of 200 broken bones." [Tr. 506]. While plaintiff has submitted emergency room records dating back to age six [Tr. 195], there is no documentation of motorcycle accidents or "200 broken

bones."[5]

Between September 2000 and November 2004, plaintiff periodically sought emergency room treatment for purported migraines. [Tr. 268, 272, 275, 284, 288, 290, 294, 364, 379, 391, 516, 558, 561, 572-73, 591, 595]. He received narcotic medication treatment at almost all of these visits.

Following the April 2002 motor vehicle accident, imaging showed fractures at C6-C7 [Tr. 348], mild displacement at C6 and moderate displacement at C7 [Tr. 360], and compression fracture at T5, T6, and/or T7 [Tr. 349-50, 358]. Plaintiff later recalled that he was supposed to undergo rehabilitation but "he got mad at the doctors and went home and rehab[bed] on his own." [Tr. 455-56]. By May 2002, there was no cervical bulging, stenosis, or subluxation. [Tr. 375, 378].

Plaintiff continued to complain of neck pain in May and July 2002. Brain and spine specialist Kevin Vaught found plaintiff to be "completely neurologically intact on examination" but with some cervical tenderness. [Tr. 374]. Plaintiff exhibited excellent strength, normal reflexes, and no cervical instability. [Tr. 372-73]. Dr. Vaught was "uncertain" as to a cause for plaintiff's purported degree of pain. [Tr. 373]. Plaintiff reported improvement by August and September of 2002. [Tr. 371-72].

In October 2002, Dr. Reeta Misra completed a Physical RFC Assessment. Dr. Misra opined that plaintiff could work at the light level of exertion with occasional postural

---

[5] Emergency room records show only two distant *ATV* wrecks resulting in a single fracture at the end of the right humerus. [Tr. 198-208].

limitations.  [Tr. 421-22].

Plaintiff received pain medications and treatment from Dr. George Aycock beginning in October 2002.  Dr. Aycock's staff "explain[ed] in great detail our narcotic contract." [Tr. 398].  On December 30, 2002, plaintiff sought treatment after purportedly falling off a thirty-foot cliff after his flashlight went out while he was "coon hunting." [Tr. 397].  Testing found soft tissue swelling around the right eye and fracture of the frontal cone, but no evidence of cervical fracture. [Tr. 417-19].  In March 2003, plaintiff reported that use of the medication Tenormin had improved his headaches and made him feel "much better," but by the following month he stated that the medication was no longer helping.  [Tr. 392-93].  Following an April 2003 examination, Dr. Michael Sullivan described plaintiff as well-developed and in no acute distress.  [Tr. 429].

On referral from Dr. Aycock, plaintiff began treatment with Dr. Michael Chavin of Morristown Pain Consultants in May 2003.  Review of a September 2002 x-ray indicated misalignment and an incompletely healed fracture of the right clavicle.  [Tr. 447].  Cervical range of motion was reduced.  [Tr. 448].  Plaintiff reported that his headaches were well-treated with Percocet.  [Tr. 450].  Dr. Chavin's records indicate that plaintiff "read and signed the narcotic agreement and any violation of this will result in discharge." [Tr. 449].

Dr. Chavin ordered new cervical and thoracic x-rays.  The cervical study was unremarkable.  [Tr. 453-54].  The thoracic study showed some disc degeneration along with possible compression fractures at T5 and T6.  [Tr. 454].

In June 2003, Dr. Chavin's staff noted that Percocet remained helpful but plaintiff had "been using more [Percocet and Valium] than what was prescribed to him." [Tr. 445]. Plaintiff was warned that "if he was short again he would be discharged." [Tr. 445]. Two and four weeks later, plaintiff reported that he was alert and functional, and that medication was helping control his pain level. [Tr. 443-44]. In August 2003, plaintiff reported that he was "much better" and that he was going out with friends, increasing his daily activities, and had "actually gone [on] a trip recently with a friend and tolerated it very well." [Tr. 442].

Dr. Marianne Filka performed a consultative physical examination on October 1, 2003. Strength and range of motion were full, except for mildly reduced range of motion of the neck. [Tr. 459]. Gait was normal, and no tenderness was observed except for "some mild tenderness over the bony spinal processes." [Tr. 459-60]. Neck and back findings were termed "minimal." [Tr. 460]. Dr. Filka predicted that plaintiff would be limited to lifting no more than 35 pounds due to neck and back pain. [Tr. 460]. "Other than that, [she] would not restrict him in any way[.]" [Tr. 460].

Dr. George Bounds completed a Physical RFC Assessment the following week. Dr. Bounds opined that plaintiff could work at the light level of exertion with occasional postural limitations and limited pushing and pulling with the legs. [Tr. 463-64]. Dr. Bounds considered plaintiff's pain "credible" but "controlled." [Tr. 469].

At Dr. Chavin's clinic in September and October 2003, plaintiff reported increased neck, back, and head pain at a levels of 6 and 7 on a scale of one to ten. [Tr. 440-41]. He related the pain to weather and family stressors. [Tr. 440]. On November 26, 2003, plaintiff rated his pain as between 9 and 10 secondary to having fallen while hunting. [Tr. 438]. Although plaintiff reported that Dr. Chavin's "treatment has helped him greatly and overal his quality of life has improved," this was to be his final appearance at Dr. Chavin's pain clinic.

In October 2003, plaintiff told Dr. Aycock's office that a facial plate from his 1989 surgery had shifted due to him being "beat[en] up about the face" earlier that year. [Tr. 386]. In December 2003, Dr. Aycock noted minimal objective findings to support plaintiff's back and neck pain complaints. [Tr. 384]. Dr. Aycock would not prescribe additional narcotics. [Tr. 383]. This would be plaintiff's final visit with Dr. Aycock.

Plaintiff began a treatment and prescription medication relationship with Dr. Robert Locklear in January 2004. In February and March 2004, plaintiff reported that his pain continued but that he was "doing pretty well." [Tr. 521, 523]. In May 2004, he complained of "not doing very well" due to neck pain and a migraine. [Tr. 516].

In June 2004, Dr. Robin Richard completed a Physical RFC Assessment. Dr. Richard opined that plaintiff could work at the light level of exertion with occasional postural limitations and no climbing of ropes or scaffolding. [Tr. 565-66].

In September 2004, plaintiff told Dr. Locklear that he was "doing pretty well," but did not "think he would be able to stand the pain if he didn't have the pain medicines." [Tr. 581]. At his next appointment in November 2004, plaintiff reported that he was "hurting worse with the cold weather" and complained of continuing headaches. [Tr. 576]. A contemporary thoracic MRI showed a compression fracture at T5 along with "mild degenerative changes." [Tr. 583]. A cervical MRI indicated "mild congenital spinal stenosis" which, in the opinion of radiologist Raymond Kohne, "should not currently be causing any significant radiculopathy." [Tr. 582].

Dr. Locklear generated a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" in December 2004. He opined that plaintiff can lift no more than three pounds due to chronic pain syndrome. [Tr. 588]. For the same reason, plaintiff would be able to sit and stand for no more than a total of three hours per workday. [Tr. 588]. Dr. Locklear further predicted postural, physical, and environmental restrictions secondary to chronic pain, stiff and unsteady gait, and decreased mobility, and "very poor endurance." [Tr. 589].

B. Mental

Clinical psychologist Rexford Burnette performed a mental status examination in October 2003. Plaintiff complained of anxiety, nightmares, insomnia, and panic attacks. [Tr. 471]. Dr. Burnette found plaintiff's thought, memory, affect, and behavior to be normal. [Tr. 472]. Dr. Burnette predicted no significant vocational limitations. [Tr. 473].

On January 7, 2004, Dr. Timothy Sullivan described plaintiff as appearing "extremely anxious." [Tr. 490]. It is noteworthy that plaintiff had recently been discontinued from all prescription medications. [Tr. 490].

Nonexamining Dr. Kourany completed a Mental RFC Assessment in March 2004. Dr. Kourany predicted no limitations of more than a moderate degree, expressly agreeing with Dr. Burnette's assessment. [Tr. 546-48].

## C. Substance Abuse

Plaintiff claims that his estranged father taught him to sell drugs at approximately age eleven. [Tr. 505]. He "reports having had a serious problem with cocaine, crack, pot, and LSD in the past." [Tr. 505]. Plaintiff also reports "a bunch" of arrests for DUI, marijuana possession, and public intoxication. [Tr. 471].

In May 1997, plaintiff underwent a four-day hospitalization at Columbia Indian Path Pavilion for polysubstance detoxification. [Tr. 238]. Dr. T.H. Roberson, Jr. noted that plaintiff was "rather manipulative and tried to obtain multiple medications." [Tr. 238]. Although he testified at his January 2005 administrative hearing that he has not used cocaine since 1993 [Tr. 812], plaintiff returned to Indian Path in September 1997 for six days, explaining that "I got back on cocaine." [Tr. 239]. At that time, he reported daily marijuana use and "two to three 8 battles [sic] of cocaine" per week. [Tr. 239]. Plaintiff returned for another six-day detoxification in 1999 due to "recurrent use of polysubstances especially alcohol and . . . opiates." [Tr. 241]. Plaintiff also told Dr. Filka in October 2003 that he had

13

not used cocaine since 1993 [Tr. 457], but in December 2003 he represented to social worker Kathy Ross that his cocaine usage did not stop until 2000 [Tr. 505].

The April 2002 fatal motor vehicle accident involved alcohol consumption, and plaintiff tested positive for marijuana. [Tr. 315, 812]. However, in October 2003, plaintiff told Dr. Filka that he had not smoked marijuana since 1993 [Tr. 457] and he told Dr. Burnette that he had been abstinent from "all substances" for "years." [Tr. 470].

At the January 2005 administrative hearing, plaintiff testified that he had consumed no alcohol since the fatal 2002 accident [Tr. 812], and in 2003 he denied current alcohol use to Dr. Michael Sullivan [Tr. 428] and Dr. Chavin [Tr. 447]. However, in December 2003, he told social worker Kathy Ross that he drinks bourbon and moonshine "occasionally." [Tr. 505]. This was a mere fifteen days prior to telling Dr. Aycock that he uses no alcohol. [Tr. 383].

In December 2003, plaintiff also told social worker Ross that he smokes marijuana "occasionally." [Tr. 505]. This was a mere eleven days prior to telling nurse Debbie [Illegible] that he no longer uses marijuana. [Tr. 499]

By an Activities of Daily Living Questionnaire dated June 20, 2003, plaintiff told the Commissioner that he does not use alcohol or drugs. [Tr. 126-27]. By an Activities of Daily Living Questionnaire dated January 28, 2004, plaintiff again told the Commissioner that he does not use alcohol, but he did not answer the question pertaining to current drug use. [Tr. 185-86].

On December 11, 2003, Dr. Chavin terminated his treatment of plaintiff due to "noncompliance with med check and urine drug screen." [Tr. 437]. On December 6, 2003, plaintiff told Dr. Aycock that he had been discharged from Dr. Chavin's practice because

> he was to call to come for an appointment last Wednesday and he couldn't show up and he got mad because he couldn't get a ride and threw all of his pain medications into the fireplace. We called the pain clinic, and what they are telling us is that he was asked to come in for a random urine drug screen as there were some suspicions about whether he was taking his medicines, and they gave him 24 hours to come in, and he is now being dismissed.

[Tr. 384]. In another version of the facts, plaintiff told social worker Ross that *he* "discontinued his MS Contin due to inability to get to a pain clinic appointment and deciding to try to live without the medication." [Tr. 489].

Dr. Aycock then apparently ordered a December 2003 urine screen, which came back positive for marijuana. [Tr. 403]. In addition, plaintiff called Dr. Aycock's office on December 22, 2003, requesting Valium. Dr. Aycock would not issue the prescription, and plaintiff told the staff that he "will just go out and find them somewhere else." [Tr. 383]. The record reflects no further treatment by Dr. Aycock, who by letter dated February 4, 2004, discharged plaintiff due to "[y]our inability to comply with our recommended course of treatment." [Tr. 382].

The previous month, plaintiff told Dr. Locklear that he uses no alcohol or marijuana. [Tr. 526]. Similarly, plaintiff's administrative hearing testimony was that he has "no problem with any drugs or alcohol at this time." [Tr. 812].

V.

*Vocational Expert Testimony*

Donna Bardsley ("Ms. Bardsley" or "VE") testified as a vocational expert at the administrative hearing. The ALJ presented a hypothetical claimant of plaintiff's age, education and work history. The hypothetical claimant could lift no more than 35 pounds occasionally and ten pounds frequently, could have no exposure to respiratory irritants, and would be limited to simple, unskilled, low-stress jobs. [Tr. 819]. Ms. Bardsley testified that jobs such as packager, sorter, assembler, inspector, and clerk, would be available in sufficient numbers in the regional and national economies under that hypothetical. [Tr. 819-20].

The ALJ then presented a second hypothetical, identical to the first except that the claimant would be limited to sedentary work. [Tr. 820]. In response, the VE again identified jobs, such as cashier, packager, assembler, sorter, and clerk, that would be available in sufficient numbers in the regional and national economies. [Tr. 820].

If Dr. Locklear's assessment were fully credited, Ms. Bardsley testified that all employment would be precluded. [Tr. 820]. If plaintiff's subjective complaints were deemed fully credible, all employment would be precluded by pain, migraines, confusion, limited short-term memory, and the need for excessive rest. [Tr. 821].

# VI.

## *Analysis*

On appeal, plaintiff argues that the ALJ erred in his analysis of: (1) Dr. Locklear's opinion; (2) mental health complaints; (3) migraines; and (4) the Physical RFC Assessments. The court will address these issues in turn.

## A. <u>Treating Physician</u>

As noted, Dr. Locklear generated an extremely restrictive assessment which, if credited, would preclude all employment. The ALJ rejected Dr. Locklear's opinion, finding the assessment to be inconsistent with plaintiff's representations and the objective evidence of record. [Tr. 24]. The Commissioner is not required to accept a treating physician's opinion if it is not supported by sufficient medical data and if a valid basis is articulated for the rejection. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

In the present case, the ALJ did not assign controlling weight to Dr. Locklear's opinion because he found that it exceeded the documentary evidence. That conclusion is supported by substantial evidence. Certainly, the record indicates that plaintiff has had some facial reconstructive surgery and that he has some spinal imperfections. This is evidence of conditions that could reasonably be expected to cause some discomfort. *See generally Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986). However, a reasonable fact-finder could conclude that plaintiff's documented conditions are not "of such

a severity that [they could] reasonably be expected to produce the alleged disabling pain."

*See id.* at 853. Plaintiff's extreme subjective complaints simply are not consistent with the record as a whole, both in terms of physical examinations and in terms of the inconsistencies and credibility issues noted throughout this opinion.

Dr. Locklear based his opinion in part on chronic pain syndrome related to the 1989 motor vehicle accident, which involved "full cardiac arrest" and "multiple surgeries." [Tr. 588]. The administrative record, however, contains no contemporary documentation of 1989 treatment. Dr. Locklear, therefore, relied on plaintiff's dubious self-reporting. For example, there is no objective documentation of plaintiff ever suffering a "full cardiac arrest."

Dr. Locklear also cited a stiff and unsteady gait, poor endurance, and decreased mobility in support of his extreme assessment. However, Dr. Filka observed plaintiff's gait to be "normal." Also, while plaintiff claims to suffer poor endurance and decreased mobility, he has (after his purported disability onset date) remained able to lay flooring, climb a roof, "walk in the woods," travel with a friend, fish, and repeatedly "coon hunt."

The court further notes that Dr. Locklear's recorded objective findings are largely unremarkable, whereas brain and spine specialist Dr. Vaught was "uncertain" as to a cause for plaintiff's purported degree of pain [Tr. 373] and radiologist Kohne opined that cervical MRI findings "should not currently be causing any significant radiculopathy." [Tr. 582]. Also, in September 2004, plaintiff told Dr. Locklear that he was "doing pretty well"

through use of pain medication [Tr. 581], which he testified causes no side nullifies.  [Tr. 803].

Additionally, it is apparent that Dr. Locklear formed his opinion without knowledge of plaintiff's polysubstance abuse history, as plaintiff misled him on that point. [Tr. 526].  In fact, as chronicled in Section IV(C) of this opinion, at virtually every opportunity plaintiff has manufactured a different version of the facts relating to his substance abuse.  Post-onset date physical activities - in particular, his repeated "coon hunting" trips - further diminish his credibility.

In sum, the ALJ adequately explained his rejection of Dr. Locklear's extreme assessment by citing the lack of supporting objective evidence, inconsistencies with the record as a whole, and credibility issues pertaining to plaintiff's subjective complaints.  That decision survives substantial evidence review and will not be reversed by this court.

B. Mental Health

Next, plaintiff contends that the ALJ inadequately considered his complaints of anxiety, depression, and PTSD.  This argument is without merit.

The only mental/vocational assessment of record was provided by clinical psychologist Burnette following a mental status examination in October 2003.  As noted by the ALJ [Tr. 23], Dr. Burnette predicted no significant vocational limitations. [Tr. 473].  Dr. Kourany's Mental RFC Assessment was consistent with Dr. Burnette's opinions.  [Tr. 546-48].  Although psychiatrist Timothy Sullivan described plaintiff as appearing "extremely

anxious," this observation coincided with plaintiff having been recently discontinued from all prescription medications due to his dismissals from Drs. Chavin's and Aycock's care for failing/refusing drug tests and failing to following prescribed treatment.

In sum, the objective mental health evidence of record does not support restrictions greater than those assessed by the ALJ. In light of the credibility and substance abuse issues rampant in this case, the ALJ in fact was likely generous in "giv[ing] the claimant the benefit of the doubt in limiting him to simple, low stress work." [Tr. 24]. The remaining mental health evidence cited by plaintiff is almost wholly based on his unreliable self-reporting and is not cause for reversal.[6]

---

[6] To the extent that plaintiff seeks to rely on various mid-range to low Global Assessment of Functioning ("GAF") scores found in the record, those scores have no bearing on the court's analysis in light of plaintiff's grossly unreliable self-reporting.

> The [GAF] score is a *subjective* determination that represents the clinician's judgment of the individual's overall level of functioning. . . . [A] score may have little or no bearing on the subject's social and occupational functioning. . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [GAF] score in the first place.

> Moreover, the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [SSI] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.

> . . .

> . . . Any failure to reference [GAF] scores or to compare different scores attributed to the same subject, without more, does not require reversal.

*DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415-16 (6th Cir. 2006) (citations and quotations omitted) (emphasis added).

C. <u>Migraines</u>

The ALJ considered plaintiff's migraine complaints but concluded that they "are not shown to be of the nature, frequency, severity, or duration as to interfere with competitive employment." [Tr. 21]. Plaintiff argues that the ALJ erred both in not finding migraines to be a "severe" step two impairment and in not further limiting his RFC based on headaches.

As for the first argument, this is not a case in which a claimant has alleged only one impairment. In such cases, of course, an adverse determination at step two causes the entire application to be "screened out" as "totally groundless." *See Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988). By contrast, in the present case plaintiff alleges - and the ALJ recognized - multiple severe impairments. Accordingly, despite the finding that migraines were not a "severe" impairment in this case, plaintiff's claim survived step two. *See, e.g., Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

As for additional RFC limitations that should have been assessed based on headaches, the court again recognizes objective evidence of underlying conditions such as facial reconstructive surgery and spinal imperfections that could reasonably be expected to cause some discomfort. However, to further restrict plaintiff's RFC based on his subjective headaches complaints would require reliance on his self-reporting, which any reasonable fact-finder could justifiably choose not to do.

Plaintiff frequently told treating physicians that his headaches were controlled with medication, and no source predicted any limitations secondary to headaches. The court finds no error.

## D. Physical RFC Assessments

Lastly, plaintiff criticizes the ALJ for not adopting the postural restrictions predicted by nonexamining physicians Misra, Bounds, and Richard. The ALJ explained that he "agree[d] with the opinion of the State Agency [reviewing physicians] that the claimant *can perform light exertion.* However[,] greater weight is given to the opinion of Dr. Filka." [Tr. 24] (emphasis added). It was certainly within reason to adopt the opinion of Dr. Filka, who personally examined plaintiff and found no postural limitations, over the opinions of sources who did not personally examine him. The court finds no error. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (citation omitted).

## VII.

### *Conclusion*

After his alleged onset date plaintiff has remained able to continue his substance abuse, ascend roofs, "coon hunt," fish, lay flooring, "walk in the woods," and travel. It is not unreasonable to conclude that he also remains able to work within the generous RFC parameters found by the ALJ. The Commissioner's final decision will be

affirmed, and an order consistent with this opinion will be entered.

ENTER:

_____
        s/ Leon Jordan
United States District Judge